UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CITY OF ST. LOUIS,

                Plaintiff,

                                          Case Number 07-13683-BC
v.                                         Honorable Thomas L. Ludington

VELSICOL CHEMICAL CORP., NWI-1, INC.,
formerly known as Fruit of the Loom;
LEPETOMANE II, INC., as Trustee of the Fruit
of the Loom Successor Liquidation Trust;
LEPETOMANE III, INC., as Trustee of the Fruit
of the Loom Custodial Trust; EDGEWOOD
FARMS, INC.; JOHN DOES 1-300;

                Defendants,

UNITED STATES OF AMERICA,

                Intervenor.
_____/

## ORDER DENYING PLAINTIFF'S MOTION TO REMAND, GRANTING THE UNITED STATES' MOTION TO INTERVENE, AND DENYING PLAINTIFFS' MOTIONS TO STRIKE

      On July 9, 2007, Plaintiff City of St. Louis filed a complaint in Gratiot County Circuit Court

arising out of the contamination and threatened contamination of its drinking water system against

Velsicol Chemical Corporation; NWI-1, Inc.; Lepetomane II, Inc., as Trustee of the Fruit of the

Loom Successor Liquidation Trust; Lepetomane III, Inc., as Trustee of the Fruit of the Loom

Custodial Trust; Edgewood Farms, Inc., and John Does 1-300. On August 31, 2007, Lepetomane

II and III and NWI-1 removed the case to this Court. Velsicol consented to the removal. Edgewood

Farms has not yet appeared or answered the complaint.

      The notice of removal asserts that federal subject matter jurisdiction is premised on

bankruptcy removal jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 1452(a), federal officer removal jurisdiction pursuant to 28 U.S.C. § 1442(a), and diversity jurisdiction pursuant to 28 U.S.C. § 1332. Now before the Court are Plaintiff's motion to remand [Dkt. # 16] filed on October 8, 2007; and the United States' motion to intervene [Dkt. # 30] filed on December 14, 2007. The Court held a hearing on the motions on January 23, 2008. Shortly thereafter, pursuant to the parties' requests, the Court stayed the proceedings to allow the parties to devote full efforts to investigating settlement alternatives.

Subsequently, on January 15, 2010, the Court lifted the stay, noting the extended period of time that the case had been stayed without coming to a negotiated resolution. The Court provided the parties with an opportunity to supplement the prior briefing, and held a second hearing on February 24, 2010. As further explained below, Plaintiff's motion to remand will be denied because the Court has bankruptcy removal jurisdiction pursuant to §§ 1334(b) and 1452(a) and federal officer removal jurisdiction pursuant to § 1442(a). In addition, the United States' motion to intervene will be granted to allow the United States to protect its interests.

I

Plaintiff City of St. Louis is organized as a municipal corporation and owns and operates a public drinking water system that provides drinking water to residents and businesses in and around St. Louis, Michigan. Compl. ¶¶ 1, 6 (Notice of Removal Ex. A). The water system includes production wells that draw drinking water from groundwater aquifers, and pumping, storage, and distribution facilities and equipment. *Id.* ¶ 6. Plaintiff alleges that it has "a significant property interest in the waters it appropriates and uses from its wells." *Id.* ¶ 6.

Plaintiff alleges that from 1965 to 1978, Velsicol owned and operated a fifty-two acre DDT

(dichlorodiphenyltrichlorethane) manufacturing site ("plant site") on the Pine River in St. Louis, Michigan, where it manufactured, stored, and handled DDT and various DDT related by-products and wastes, including p-CBSA (para-Chlorobenzene Sulfonic Acid). *Id.* ¶¶ 7, 26. DDT was used as a pesticide in agriculture, until it was prohibited by the federal government in 1972 due to the substantial risks it posed to human health and the environment. *Id.* ¶¶ 2, 18. Likewise, the by-product p-CBSA negatively impacts human health and the environment. *Id.* ¶ 20.

Plaintiff alleges that Velsicol utilized poor waste management practices at the plant site and various locations in and around St. Louis, where it "injected, buried, discharged, disposed of, failed to contain and/or otherwise released into the environment p-CBSA and other harmful chemicals." *Id.* ¶¶ 7, 29. Plaintiff refers to these locations as "Contaminated Sites." *Id.* ¶ 3. In particular, Plaintiff alleges that from the 1930s to the 1970s, Velsicol and its predecessor in interest stored and disposed of p-CBSA and other hazardous wastes at a Contaminated Site known as the "burn pit" or "golf course site," located across the Pine River from the main Velsicol site. *Id.* ¶ 28. Plaintiff also alleges that Velsicol discharged contaminants directly into the Pine River, making it unadvisable to eat fish from the Pine River to this day. *Id.* ¶ 27.

Additionally, Plaintiff alleges that each Defendant to this action is a current or former operator or owner of the Contaminated Sites. *Id.* ¶ 4. Plaintiff alleges that Edgewood Farms, and possibly others, acquired the golf course site at some unidentified point in time. *Id.* ¶ 28. Plaintiff alleges that Northwest Industries ("NWI") purchased Velsicol in 1965 and that NWI became the successor owner of the plant site in 1986. *Id.* ¶ 8. Plaintiff alleges that at some point NWI became a subsidiary of Fruit of the Loom, Inc. ("FTL"). *Id.* ¶ 8. Through a bankruptcy proceeding that began in December 1999, FTL and NWI were reorganized into NWI-1, Inc. *Id.* ¶ 8. Lepetomane

III is the Trustee of the Custodial Trust, which was created through the bankruptcy proceeding to manage and address the environmental liabilities related to seven properties of which it became the owner, at least one of which is a Contaminated Site. *Id.* ¶ 9. Lepetomane II is the Trustee of the Successor Trust, which was created through the bankruptcy proceeding to hold financial assets on behalf of the Custodial Trust to be used for remediation of the seven properties owned by the Custodial Trust. *Id.* ¶ 10.

Plaintiff alleges that p-CBSA and other harmful chemicals from the Contaminated Sites have migrated and continue to migrate in the earth's subsurface, contaminating and imminently threatening to contaminate Plaintiff's wells and water supply. *Id.* ¶¶ 3, 7, 21, 25, 29. Plaintiff alleges that p-CBSA has been detected at varying times and in varying amounts in water extracted from Plaintiff's wells, and further alleges that because p-CBSA is highly soluble in water and moves freely at approximately the rate of the groundwater's flow, its presence is known to be a precursor to detection of other harmful chemicals from the same source. *Id.* ¶ 2, 20, 24, 33.

Plaintiff alleges that in 1982, as part of a clean-up effort, Velsicol removed contamination at the golf course site and other Contaminated Sites, deposited those contaminated soils at the plant site, and attempted to contain the contamination there. *Id.* ¶ 30. Despite the effort, the containment system continues to leak various harmful chemicals into the Pine River and the drinking water aquifer, "all to Plaintiff's detriment and injury." *Id.* ¶ 30. Plaintiff alleges that its injuries constitute an "unreasonable interference with, and damage to, the limited subterranean supplies of fresh drinking water on which Plaintiff's wells depend and in which Plaintiff has a significant property interest." *Id.* ¶ 34. Plaintiff alleges that its "interest in protecting the quality of its limited drinking water supplies constitutes a reason personal for seeking damages sufficient to restore and/or replace

such drinking water supplies to their pre-contamination condition." *Id.* ¶ 34.

Plaintiff seeks an award of exemplary damages against Velsicol, in an amount that is "sufficient to compensate Plaintiff for the humiliation, outrage, and indignity it has suffered by Velsicol's wanton acts." *Id.* ¶ 32, 57, 66, 74. Plaintiff alleges that Velsicol knew or should have known of the "grave harm and threat to public health" that its poor waste management practices caused and knew or should have known that its actions were threatening widespread pollution of groundwater, contamination of public and private drinking water supplies, and increased costs to public water suppliers and their customers. *Id.* ¶ 2, 31. Plaintiff alleges that Velsicol "knew that it was substantially certain" that its acts and omissions would cause injury and damage, including contamination of water supplies by p-CBSA and other harmful chemicals. *Id.* ¶ 32.

Count one of the complaint alleges violations of the Michigan Natural Resources Environmental Protection Act ("NREPA"), Mich. Comp. Laws § 324.20126a(7), against each Defendant, except Edgewood Farms. *Id.* ¶¶ 36-46. Plaintiff alleges that Velsicol and NWI-1 are jointly and severally liable for Plaintiff's necessary response costs because each owned and operated one of more of the Contaminated Sites at the time of the disposal of the hazardous wastes, and was responsible for causing the release and threat of release of the hazardous substances. *Id.* ¶ 42. Similarly, Plaintiff alleges that the Custodial and Successor Trusts are also jointly and severally liable because the Custodial Trust owns and operates one of the Contaminated Sites and the Successor Trust "is the trust of the Custodial Trust." *Id.* ¶¶ 44-45. Plaintiff alleges that necessary response costs include monitoring and investigation costs, studies, treatment and replacement of wells, and other remedial actions to remove p-CBSA from its drinking water supplies. *Id.* ¶ 46.

Count two of the complaint alleges nuisance against all Defendants. *Id.* ¶¶ 47-57. Plaintiff

states that it is "the owner of land, easements and water rights that permit it to extract groundwater for use in its Water System. Plaintiff's injury is separate and distinct from that of the public." *Id.* ¶ 48. Plaintiff alleges that plumes of contamination originating from the Contaminated Sites have migrated and continue to migrate through the subsurface, contaminating and threatening to contaminate Plaintiff's water supplies, creating a nuisance. *Id.* ¶ 49. Plaintiff alleges that Velsicol and NWI-1 caused, created, maintained, assisted, or participated in the nuisance. *Id.* ¶ 50. Plaintiff alleges that the Trusts and Edgewood Farms, as owners and operators of Contaminated Sites, knew or should have known of the unreasonable risk of nuisance and failed to take reasonable steps to abate the condition. *Id.* ¶ 51, 52. Plaintiff alleges that the nuisance has caused "substantial injury and significant harm to Plaintiff's wells and water supply, in which Plaintiff has a significant property interest." *Id.* ¶ 54. Plaintiff alleges that Defendants have substantially and unreasonably interfered with its right to appropriate, use and enjoy groundwater from its wells. Plaintiff is specially and adversely affected by the nuisance." *Id.* ¶ 55. Plaintiff again alleges contamination by p-CBSA and threatened contamination by other chemicals. *Id.* ¶ 56.

Count three alleges trespass against all Defendants. *Id.* ¶ 58-66. Plaintiff alleges that is the owner and actual possessor of its water system, including drinking water production wells that draw groundwater from one or more aquifers. *Id.* ¶ 59. Plaintiff alleges that it owns, possesses and actively exercises property rights to appropriate and use groundwater drawn from drinking water production wells. *Id.* ¶ 60. Plaintiff alleges that Velsicol and NWI-1 failed to properly control, handle, contain, or dispose of p-CBSA, which has entered Plaintiff's property without authorization, and other harmful chemicals that threaten to enter Plaintiff's property without authorization. *Id.* ¶ 61. Plaintiff alleges that the Trusts and Edgewood Farms knew or should have known of the

trespass or unreasonable risk thereof and ratified the intrusion by failing to remove or take reasonable steps to remove the continuing trespass. *Id.* ¶ 63.

Count four of the complaint alleges negligence against all Defendants. *Id.* ¶¶ 67-74. Plaintiff alleges that Defendants had a duty to Plaintiff to use due care in the storing, containment, handling, and disposal of p-CBSA and other harmful chemicals, and breached that duty. *Id.* ¶ 68. Plaintiff alleges that Velsicol and NWI-1 breached the duty by injecting, burying, disposing of and failing to contain p-CBSA and other harmful chemicals. *Id.* ¶ 69. Plaintiff alleges that the Trusts and Edgewood Farms knew or should have known of the unreasonably dangerous conditions to persons and property and failed to take reasonable steps to protect Plaintiff from it. *Id.* ¶ 71.

Count five seeks declaratory relief against all Defendants. *Id.* ¶¶ 75-77. Finally, in its concluding request for relief, Plaintiff seeks compensatory damages, necessary response costs including enforcement costs, exemplary damages against Velsicol, and attorneys' fees and costs incurred in prosecuting this action, including prejudgment interest. *See also id.* ¶ 6. Plaintiff also seeks to recover "the substantial costs necessary to protect the public and restore and/or replace its damaged drinking water supply wells." *Id.* ¶ 1. Plaintiff seeks to recover "compensatory and all other damages, including all necessary funds to investigate and monitor any contamination of, or pollution to, Plaintiff's water supply; to reimburse Plaintiff for the costs of designing, constructing, installing, operating and maintaining the treatment facilities and equipment required to remove p-CBSA and other harmful chemicals from its drinking water supplies and finding an alternative water supply and constructing a new water system; and thereby ensuring that the responsible parties bear such expense, rather than Plaintiff and its ratepayers." *Id.* ¶ 5.

II

Significant factual background information is found in the notice of removal and attached exhibits and the response to Plaintiff's motion to remand filed by Lepetomane II and III and NWI-1. The most pertinent documents include a "five-year report" prepared in 2007 by the United States Environmental Protection Agency ("EPA") with respect to contamination in St. Louis[1]; and certain documents from the bankruptcy proceeding, including the Third Amended Plan of Reorganization and Plan Supplement,[2] the Confirmation Order,[3] the Settlement Agreement ("S. Agmt."),[4] the United States' motion for approval of the settlement agreement,[5] the order approving the settlement agreement,[6] the Successor Liquidation Trust Agreement ("SLT Agmt."),[7] and the Custodial Trust Agreement ("CT Agmt.").[8]

Also important is a general understanding of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. § 9601 et seq.:

> By the late 1970s, Congress concluded that existing cleanup programs were inadequate to the task of taking care of literally thousands of sites across the country posing a serious threat to public health and the environment. Consequently, in 1980, Congress enacted CERCLA, also known as "Superfund," to ensure prompt and efficient cleanup of hazardous waste sites and to place the costs of those cleanups on the PRPs [potentially responsible

---

[1] Resp. Br. Ex. B.

[2] Notice of Removal Ex. B.

[3] Notice of Removal Ex. C.

[4] Notice of Removal Ex. D.

[5] Resp. Br. Ex. A.

[6] Notice of Removal Ex. E.

[7] Notice of Removal Ex. G.

[8] Notice of Removal Ex. H

parties].

Throughout the 1980s, the Superfund hazardous waste cleanup program enjoyed centerstage prominence in environmental law. Nevertheless, the early years of CERCLA were difficult. CERCLA was a hastily-assembled bill which contained a number of technical flaws due to Congress' limited understanding of the hazardous waste problem and its effects on the environment. Both Congress and EPA, for example, believed in the late 1970s that a site could be adequately cleaned up by "scraping a few inches of soil off the ground." Congress also grossly underestimated the number of sites requiring cleanup and the monies necessary to remedy the problem. EPA, as the delegatee of the President's authority under CERCLA, 42 U.S.C. § 9615, was criticized for the slow pace of cleanups, for failing to provide remedies that would protect public health and the environment, and for alleged "sweetheart" deals that reduced cleanup costs for industry at public expense. As a result, in 1986 Congress passed SARA, which reauthorized and amended CERCLA in several important ways. Congress sought to better define cleanup standards, to expand resources available to EPA for investigations and cleanups, to clarify EPA's authority under Superfund law, and to expand and clarify the states' role in any remedial action undertaken, or ordered, by EPA.

CERCLA applies "primarily to the cleanup of leaking inactive or abandoned sites and to emergency responses to spills." The Act directs EPA to develop a National Priorities List ("NPL") for response priority purposes. 42 U.S.C. § 9605(a). After a site is placed on the NPL, a Remedial Investigation and Feasibility Study ("RI/FS") is performed to define the nature and extent of the threat posed by the release and to evaluate proposed remedies. 42 U.S.C. §§ 9604, 9622; 40 C.F.R. § 300.68(d). Once EPA determines under CERCLA that a response action is needed at a particular hazardous waste site, it must publish a proposed remedial action plan ("RAP") and provide an opportunity for comment. 42 U.S.C. § 9617. EPA then issues a Record of Decision ("ROD") setting forth the remedy selected for the site, including remedial technologies and cleanup standards. 42 U.S.C. § 9617.

In implementing its RAP, EPA may pursue one of three possible courses of action. EPA may undertake a response measure on its own, which may include removal and/or remedial action,[9] and then sue PRPs if it can find for reimbursement. 42 U.S.C. §§ 9604, 9607. In the interim, or in the event it cannot locate any PRPs or they cannot be made to pay the cleanup costs, the government-initiated cleanup may be financed by the "Superfund," 42 U.S.C. § 9611, a trust fund derived from general federal revenues and an excise tax on specified chemicals. *See* 42 U.S.C. § 9631. Secondly, EPA may, independent of fund-financed response actions, issue an administrative order directing PRPs to implement removal or remedial action. 42 U.S.C. § 9606. Alternatively, EPA may apply to the district court for an injunction to compel PRPs to clean up or abate an actual or threatened release of hazardous substances from a facility. *Id.* As a third option, EPA may enter into an agreement with PRPs to perform a response action, 42 U.S.C. § 9622.

---

[9] "Removal" actions are typically short term or temporary cleanup measures. "Remedial" actions, on the other hand, are generally long term or permanent containment or disposal programs. The terms are further defined in 42 U.S.C. §§ 9601(23), 9601(24).

*United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1416-18 (6th Cir. 1991) (citations omitted; footnote in original).

      With specific attention to the history of the Velsicol Facility in St. Louis, the EPA five-year report provides as follows:

> Michigan Chemical Corporation (MCC) purchased the [St. Louis Velsicol] facility in 1935 and operated a chemical manufacturing business until 1977, when MCC merged with Velsicol Chemical Corporation (Velsicol). From 1936 through 1977, the plant manufactured a variety of organic and inorganic chemicals. . . . The plant was closed in 1977 and decommissioning activities were initiated in 1978. The plant site represented a threat to public health, welfare, and the environment because of widespread contamination caused by poor waste management practices and direct discharge of process wastes to the adjacent Pine River.

The report affirms that St. Louis "draws its drinking water from six municipal water supply wells located within one mile of the site, and two of the wells (# 1 and #4) are located within 1/4 mile of the easternmost edge of the main plant site." The report indicates that studies from 1978 through 1980 revealed contamination in "site soils, groundwater, river sediments, and fish."

      The five-year report provides a useful summary of the attempts to manage the site from 1978 through 2007:

> Based on those early studies, U.S. EPA and the State of Michigan negotiated and entered a [Consent Judgment (CJ)] with Velsicol in 1982 for a remedy directed at stopping the migration of [hazardous chemicals] from the main plant site into the environment. . . . Under the CJ, Velsicol agreed to excavate contaminated soil from the former burn area and to place those materials on the main plant site, inside the containment system. . . . The CJ released Velsicol from liability for cleanup of the sediments that were contaminated at the time of entry of the CJ or sediments that became contaminated from migration or discharge from the main plant site prior to completion of the containment system.
>
> The 1982 CJ required Velsicol to construct a containment system for the main plant site comprised of a 2-foot thick, low permeability slurry wall around the facility and a 3-foot thick, low permeability clay cap on top. The CJ also required Velsicol to maintain groundwater levels within the containment system and to conduct long-term operation and maintenance (O&M) activities at the site. Velsicol began implementation of the CJ remedy in January 1983 and completed construction of the containment system in 1984. This work

included excavating approximately 68,000 cubic yards of contaminated material from the former burn area (Golf Course site) and placing it on the main plant site under the clay cap.

. . .

From 1993 to mid-1998, Velsicol had to pump water from the containment system and dispose of the water off-site in order to maintain the water levels within the containment system below the level established by the CJ.

. . .

In late 1994 . . . [t]he DDT concentrations in fish tissue coupled with the rising water levels inside the containment system caused concern that the containment system may have failed, increasing the loading of DDT into the Pine River.

. . .

Following the events noted above, U.S. EPA and MDEQ [Michigan Department of Environmental Quality] asked Velsicol to conduct a comprehensive assessment of the containment system to ensure that it was not a source of DDT into the Pine River, and Velsicol agreed. . . .

. . .

In 1996, Velsicol completed its assessment of the containment system. . . .

U.S. EPA and MDEQ agreed with Velsicol's containment assessment document, which stated that the clay cap was leaking. . . . No obvious problems were documented with the slurry wall. . . . In December 1997, Velsicol submitted a work plan . . . in which Velsicol proposed to conduct maintenance of the clay cap during the summer of 1998 by recompacting areas of the cap. Velsicol decided to delay this work until U.S. EPA and MDEQ completed [a] sediment removal project. Both U.S. EPA and MDEQ agreed to the delay. However, in December 1999 . . . Fruit of the Loom (FTL) and NWI Land Management, Inc. (NWI) filed for bankruptcy under Chapter 11. NWI Land Management became owner of the site in 1986 through a complicated management buyout of Velsicol Chemical Corporation. Velsicol had been a subsidiary of FTL, but in 1986 became a separate company, and title to the Velsicol St. Louis site was transferred to NWI. Velsicol Corporation continued to manage the site for NWI and FTL. When FTL filed for bankruptcy in 1999, it ceased payments to Velsicol for work at this site. . . .

. . .

The MDEQ finalized and issued the RI [remedial investigation] Report for [the main plant site] in November 2006. The RI Report . . . found that significant contamination . . . exists in soil and groundwater at the main plant site, and that soil in three areas of the residential neighborhood adjacent to the main plant site contains concentrations of PBB above MDEQ's Part 201 direct contact criteria. . . . Additionally, . . . the RI report concluded that neither the clay cap nor the slurry wall meet the original design specifications, and neither are functioning as designed. Additionally the report concluded that the slurry wall is not preventing the migration of contaminated groundwater from the main plant site and that the

containment system is therefore not protective of human health and the environment. The MDEQ is currently preparing an FS Report that will evaluate a range of potential remedial alternatives. . . .

In conjunction with the State-lead RI fieldwork, U.S. EPA also conducted . . . site investigation activities to supplement and support MDEQ's work. . . . As part of [a Source Migration Investigation], U.S. EPA sampled the City of St. Louis water supply wells and some private residential wells. No contamination was detected in the residential wells. The chemical [p-CBSA] . . . was detected in some of the city wells, including wells #1 and #4 (the closest to the site). p-CBSA is highly soluble in groundwater and is resistant to natural degradation, making it very mobile in groundwater and a useful indicator of contaminant movement. . . .

In February 2007, U.S. EPA completed installation of eight deep sentry monitoring wells screened in the same portion of the Lower Unit aquifer as the city wells to collect additional information about the geology and hydrology of the Lower Unit and to provide advance warning of potential impacts to the city wells from site-related contaminants.

[p-CBSA] has been detected in all six city wells and is routinely detected in five of the wells. . . . The levels of p-CBSA detected in the city wells to date are well below the state drinking water standard.

The report further explains that "[i]n order to ensure protectiveness, the Superfund remedy selection process needs to be completed and a protective remedy implemented. . . . Additionally, long-term protectiveness may require compliance with use restrictions that prohibit interference with remedy components, limit use of land and groundwater, and advise against fish consumption until standards are met."

As referenced in the EPA five-year report, on December 29, 1999, FTL and NWI Land Management Corporation ("NWI"), along with thirty affiliates, (collectively, "the Debtors") filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware. The U.S. EPA and State of Michigan, among others, filed claims as creditors to protect their rights to recover funds for cleanup efforts. *See, e.g.*, Resp. Br. Ex. D (U.S. proof of claim). On March 22, 2002, the bankruptcy court confirmed the Debtors' Third Amended Joint Plan of Reorganization ("the Plan"). Subsequent to the filing of a plan supplement on April 3, 2002, the Plan was amended

by the bankruptcy court's confirmation order of April 19, 2002.

Generally, under the Plan, the Debtors are discharged "from all debts of, Claims against, Liens on the property of, and Equity Interests or any other interests in [the Debtors] and their assets and properties . . . that arose at any time before the entry of the Confirmation Order (including . . . all Claims that have been, may be, or could have been asserted against NWI and on which any other member of [FTL] or Reorganized [FTL] is or may be liable in any amount and for any reason) to the fullest extent permitted by law." Plan § 13.2.1; *see also* Confirmation Order ¶¶ 26, 43(a). The discharge is deemed to be effective "regardless of whether a proof of Claim or Equity Interest therefore was filed . . . ." Plan § 13.2.1.

The Plan prohibits prosecution of discharged claims. Plan § 13.2.2; *see also* Confirmation Order ¶ 43(b). The Plan provides for the retention of jurisdiction to, inter alia, enforce the Plan's discharge and injunction provisions. Plan § 15.1(w); *see also* Confirmation Order ¶ 76. The Plan does not provide for the continuation of FTL or NWI's business operations. NWI-1 is a successor entity as to certain obligations and assets, but is essentially defunct and exists for very limited purposes.

Consistent with § 16.5 of the Plan, a settlement agreement between the EPA, Illinois, Michigan, New Jersey, Tennessee, FTL, NWI, Velsicol, and True Speciality Corporation (Velsicol's parent corporation) was incorporated into the Plan by the Plan Supplement. *See* S. Agmt. ¶ 21. The United States' motion for approval of the Settlement Agreement explains that "Congress expressed a strong preference that the United States settle with responsible parties in order to avoid spending resources on litigation rather than on cleanup," citing, inter alia, 42 U.S.C. § 9622(a). The motion also advances the following rationale for the settlement agreement:

-13-

The settlement provides a mechanism to marshal the limited related assets of FTL, NWI, and Velsicol towards the cleanup of the Seven Facilities. The Seven Properties will be held by a Trustee rather than abandoned through bankruptcy liquidation. The settlement avoids the need for protracted and expensive litigation and adjudication of the factual and legal issues. The Agreement obtains important benefits of administrative expense payments, insurance proceeds, and proceeds from the Preferred Shares that would have been subject of hotly contested litigation in the absence of the settlement.

. . .

The Agreement is consistent with CERCLA because it is expected to result in significant recoveries to help clean up the Seven Facilities that might not otherwise be obtained and avoids the abandonment of the Seven Facilities through the liquidation of the Debtors.

(citations and footnotes omitted).

The Settlement Agreement was signed on dates ranging from March 12 to April 19, 2002. It resolves claims of the United States and the State parties against the settling parties and certain related entities or persons under CERCLA, Section 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973, and the Atomic Energy Act, 42 U.S.C. § 2011 et seq. relating to the St. Louis Facility, and six other Facilities. It also requires the Plan to provide that "holders of claims against NWI/FTL other than the Parties to this Agreement shall have no rights against the NWI/FTL Successor, FTL, and the Custodial Trust other than the rights provided to holders of allowed claims as set forth specifically in Paragraph 7(b) or 8." S. Agmt. ¶ 2(f); *see also* S. Agmt. ¶ 21.[10]

_____

[10] Paragraph 7 of the Settlement Agreement provides for NWI to transfer all of its right, title and interest in Velsicol Preferred Shares to the NWI/FTL Successor. The NWI/FTL Successor "is entitled to 49.99999% of any dividends or other proceeds from the sale of the business, assets or stock that are available under law for distribution to shareholders." Generally, under Paragraph 7(a), "[t]he NWI/FTL Successor shall deposit the first $25,000,000: 100% to the Trust Accounts" from the "[d]istributions and proceeds in respect of the Velsicol Preferred Shares, including the distribution of any dividends."

Under Paragraph 7(b):

With respect to any amounts over $25,000,000 received by the NWI/FTL Successor: the first $4,450,000 to the FOL Liquidation Trust . . . for distribution to the Allowed Prepetition Secured Creditors, and then all remaining amounts shall be paid as follows: 50% to holders of Allowed

-14-

In introductory recitals, the Settlement Agreement explains that in 1986, "in connection with a management buyout of Velsicol . . . FTL, NWI, and Velsicol entered into an A&I [Assumption Indemnity] Agreement and NWI agreed to take title to the Seven Properties, as defined herein," and that "the A&I Agreement provided that under certain circumstances FTL and NWI may be contractually obligated to indemnify Velsicol for certain environmental liabilities with respect to the Seven Facilities and the A&I Facilities," and that "on February 28, 2001, the Bankruptcy Court entered an order approving the rejection by FTL of the A&I Agreement."

In its motion for approval of the Settlement Agreement the United States explained that the Settlement Agreement was based in part on Velsicol's limited ability to pay for the liabilities of the Seven Facilities after rejection of the A&I Agreement and the Debtors' bankruptcy filing:

---

General Unsecured Claims Against NWI and FTL; 25% to the Trust Accounts; and 25% to the Velsicol Environmental Trust Fund. . . . The United States may, based on revised estimates for the cost of response action and Natural Resource Damages for the Seven Facilities and the A&I Facilities, instruct the NWI/FTL Successor and Trustee to decrease the share to be paid to or held in the Trust Accounts and increase the share to be paid to the Velsicol Environmental Trust fund by the amount of this decrease. The NWI/FTL Successor will hold funds received in segregated Trust Accounts and will disburse funds from the Trust Accounts to the Custodial Trustee as provided in Paragraph 3 hereof . . . .

Paragraph 8 addresses pollution liability policies and provides, in part:

The Plan of Reorganization and/or a Bankruptcy Court order shall vest in, the NWI/FTL Successor (for the benefit of the Governmental Parties, Custodial Trust, Velsicol Environmental Trust Fund, and the FTL Insured Entities Under the PLL Policy) all of NWI, FTL, and the FTL Entities' interest in claims/proceeds/recoveries against/from the PLL Policy. . . . In addition, for the sole purpose of securing recoveries to the NWI/FTL Successor . . . the NWI/FTL Successor shall succeed to the liabilities of NWI and FTL with respect to the Seven Facilities and the A&I Facilities. Proceeds/recoveries from the PLL Policy, to the extent on account of the Seven Facilities and the A&I Facilities shall be held in trust by the NWI/FTL Successor in segregated accounts for the benefit of the Facility on account of which the recovery was obtained. With respect to recoveries on account of the Seven Facilities, the NWI/FTL Successor shall pay the Custodial Trustee in accordance with the procedures set forth in Paragraph 3(e-i) hereof. With respect to PLL coverage not relating to the Seven Facilities or the A&I Facilities, the beneficial interest in the recoveries of claims relating to such facilities pursuant to the PLL Policy shall be paid to the NWI/FTL Successor for the benefit of the FTL Insured Entities Under the PLL Policy and other entities designated in the Plan of Reorganization . . . ."

The ability to pay settlement with Velsicol is an instrumental and necessary part of the overall settlement since Velsicol's cooperation is essential to recovery of insurance proceeds and the value from a sale of the Preferred Shares. . . . The settlement also permits Velsicol to continue functioning as a productive component of the economy while contributing significant amounts towards the cleanup of the Seven Facilities and its other environmental liabilities.

. . .

Velsicol is also providing significant consideration in its interest in insurance proceeds, cooperation to give value to the Preferred Shares, and agreement to make up any shortfall if these recover less than $30 million for the Seven Facilities. . . . In the absence of the settlement, Velsicol would be unlikely to remain a viable entity if it had to pay for the cleanup of the Seven Facilities that was previously being indemnified by Debtors under the A&I Agreement.

The introductory recitals to the Settlement Agreement further explain that "on or about August 11, 2000, Velsicol filed proofs of claim against Debtors FTL and NWI, on its own behalf and on behalf of EPA and all State Environmental Agencies and Subdivisions pursuant to 11 U.S.C. § 501(b) and Bankruptcy Rule 3005, for liabilities under CERCLA, contract law, and other applicable laws for the Seven Facilities and the A&I Facilities." The recitals further provide that "the Governmental Parties contend that Debtors FTL and NWI have liability under CERCLA and the Atomic Energy Act ("AEA"), 42 U.S.C. §§ 2011 et seq. and regulations promulgated thereunder, for response action and/or response costs and Natural Resource Damage with respect to the Seven Facilities and the A&I Facilities and that they are entitled to administrative expense priority for some of the Debtors' environmental liability under CERCLA." The recitals also provide that "NWI is the owner of certain Preferred Shares of stock in True Speciality Corporation, the parent corporation of Velsicol."[11]

As pertinent here, the Settlement Agreement created two trusts, the NWI/FTL Successor

_____

[11] As used in the EPA Settlement Agreement, "Velsicol Preferred Shares" refers to the "preferred shares of stock in True Specialty Corporation owned by NWI, and to be owned by the NWI/FTL Successor, together will all rights therein."

Liquidating Trust ("Successor Trust" or "NWI/FTL Successor") and the Custodial Trust ("Custodial Trust"). Both Trusts must provide the United States with an annual budget for their administrative costs, which must be approved by the United States. SLT Agmt. § 3.4; CT Agmt. § 3.2.

The purpose of the Custodial Trust is:

> to own the Seven Properties, carry out administrative functions related to the Seven Properties as set forth herein, manage and/or fund implementation of response actions or natural resource damage assessment and restoration actions selected and approved by the relevant Governmental Parties with respect to the Seven Facilities in order to facilitate response action at the Seven Facilities and ultimately to sell the Seven Properties, if possible. . . . Contributions and accretions to the Custodial Trust shall include: (1) the Seven Properties and proceeds of any lease, sale or other disposition of the Seven Properties, (2) payments from the NWI/FTL Successor of amounts received by the NWI/FTL Successor and payable to the Custodial Trust under the terms hereof, and (3) any interest earned on funds held by the Custodial Trust.

SA ¶ 2(b). *See also* Plan § 7.22.4. The beneficiaries of the Custodial Trust are the United States, the State parties, and the Successor Liquidation Trust. CT Agmt. § 5.1.

The obligations of the Custodial Trust are described as follows:

> The Custodial Trust, to the extent of the Custodial Trust Assets, hereby assumes Consent Decree liabilities or work obligations for the Seven Facilities to be funded through the Trust Accounts as provided in Paragraph 17 of the Settlement Agreement. The Custodial Trust shall implement any institutional controls or deed restrictions requested by the Governmental Parties with respect to the Seven Properties. In the event that the Court finds that the Custodial Trust exacerbated conditions at any of the Seven Facilities or violated the provisions of this Agreement or Custodial Trust Documentation, the United States after consultation with the States, may direct that all remaining funds and future recoveries in the Custodial Trust . . . be paid to EPA (or to the States, or the designated natural resource trustees, if applicable) for use consistent with the terms of this Agreement. In no event shall the Administrative Trust Account have any liability or responsibility for any reason whatsoever as a result of the provisions contained in this Section 2.3.

CT Agmt. § 2.3. The United States or a State party "may at any time propose in writing to take title to any of the Seven Properties. Any such proposed transfer and the terms thereof are subject to approval in writing by . . . EPA and Michigan for the St. Louis Facility. . . ." S. Agmt. ¶ 13.

-17-

The purpose of the Successor Trust is to "implement this Agreement by receiving and distributing the assets held by it as set forth herein to the Custodial Trust and Velsicol Environmental Trust Fund[12] described herein and the payments to the credits of NWI and FTL described in Paragraphs 7(b) and 8 hereof." S. Agmt. ¶ 2(a). The Settlement Agreement further provides that assets of the Successor Trust shall not be used for "any purpose other than as expressly provided in this Agreement." *Id.* The United States, the State parties, the Custodial Trust, and the Velsicol Environmental Trust Fund hold beneficial interests in the Successor Trust. *Id.*; SLT Agmt. § 5.1.[13]

In further detail, the Settlement Agreement describes the Successor Trust as:

the legal successor in interest to certain rights under the PLL Policy and all of NWI's and FTL's rights under the insurance policies that are the subject of the Illinois Insurance Litigation to facilitate recoveries from such policies. Contributions and accretions to the NWI/FTL Successor shall include: (1) payment of the Allowed Administrative Expense Claims, (2) proceeds from the Illinois Insurance Litigation, (3) proceeds related to the Seven Facilities and the A&I Facilities for claims made under the PLL Policy, (4) the recoveries under the Velsicol PLL Policy for the Seven Facilities, (5) proceeds in respect of the Velsicol Preferred Shares, and (6) interest earned upon funds held by the NWI/FTL Successor. The NWI/FTL Successor shall not own or have any legal interest in the Seven Properties. Instead, the Parties will not oppose NWI's proposed transfer of, and NWI shall transfer the Seven Properties to an independent Custodial Trust which will hold title to the Seven Properties.

*See also* Plan § 7.22.3.

Both the Successor Liquidation Trust Agreement and Custodial Trust Agreement provide

---

[12] Generally, the Velsicol Environmental Trust Fund is established to hold certain settlement proceeds from insurance for facilities other than the Seven Facilities at which Velsicol may have pollution liability that would have fallen within the A&I Agreement. *See* S. Agmt. ¶ 11.

[13] In addition, Velsicol holds a beneficial interest "solely for the payment of certain attorney's and insurance recovery consulting fees," as does FTL Insured Entities Under The PLL Policy "solely for payment of certain insurance proceeds," and "holders of allowed claims against NWI and FTL in accordance with their respective interests as set forth in this Agreement which shall be implemented by the Plan of Reorganization. . . ." S. Agmt. ¶ 2(a); SLT Agmt. § 5.1.

that the respective Trustee's "powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of the [respective] Trust and Settlement Agreement and not otherwise." SLT Agmt. § 4.2; CT Agmt. § 4.2. Each trust is "authorized to perform any and all acts necessary and desirable to accomplish the purposes of the [respective] Trust." SLT Agmt. § 4.3; CT Agmt. § 4.3.

The Trust Agreements each provide for exculpation and indemnification of the Trustees, NWI, and FTL against "holders of claims and other parties in interest, of and from any and all claims, causes of action and other assertions of liability arising out of ownership of the [respective] Trust Assets and the discharge of powers and duties conferred upon the [respective] Trust and the [respective] Trustee by the Plan, the Settlement Agreement, this Agreement or any order of the Court entered pursuant to or in furtherance of [those], other than actions or omissions to act to the extent determined by a final order of the Court to be due to their own willful misconduct or fraud . . . ." SLT Agmt. § 4.10; CT Agmt. § 4.10.

The Trust Accounts were to receive initial funding in the amount of the Allowed Administrative Expense Claims, which was $4,292,808, subject to certain reductions. S. Agmt. ¶¶ 3(b), 4(a). After the initial funding, proceeds received from certain insurance litigation and proceeds from the Velsicol Preferred Shares were to be allocated among the Seven Facilities, including "28% for response action or costs for the St. Louis Facility." S. Agmt. ¶ 4(a). The United States reserved the right to notify the parties and Trustees that its estimates have changed and to revise the percentage allocation. *Id.* The Settlement Agreement particularly noted: "With respect to the St. Louis facility, after additional response action is selected for this Facility, EPA and Michigan shall notify the Parties, NWI/FTL Successor, and the Custodial Trust as to how the percentage

allocation/funding for the Facility will be equitably allocated between operation and maintenance and other response action/costs . . . ." *Id.*

Under the Settlement Agreement, the United States on behalf of EPA is entitled to "an Allowed General Unsecured Claim against NWI in the total amount of $61,552,537 . . . [including] $60 million for unreimbursed past and future response costs for [the Pine River site] of the St. Louis Facility." S. Agmt. ¶ 4(b). The agreement provides that "Allowed General Unsecured Claims under this Agreement shall not be discriminated against or subordinated to other allowed general unsecured claims against NWI and shall receive the distribution afforded such claims against NWI in accordance with the Plan of Reorganization." *Id.*

The Settlement Agreement provides that the Trusts will not "be held liable to any third parties for any liability, action, or inaction of any other Party, including each other." S. Agmt. ¶ 10(b). It further provides that if an action is filed against either Trust "by third parties seeking to hold either responsible for any liability, action, or inaction":

> the United States, after consultation with the States, may direct that some or all of the remaining funds and assets in the Custodial Trust and the NWI/FTL Successor . . . be transferred to EPA (or to the States, or the designated natural resources trustees, if applicable) for use consistent with the terms of this Agreement.

*Id.*[14]  The Trusts are "deemed to have resolved their civil liability under CERCLA to the United States and the States and have contribution protection against any claims for contribution for existing contamination at the Seven Facilities." S. Agmt. ¶ 10(c); CT Agmt. § 2.9. The Settlement Agreement required FTL to seek a confirmation order that provides, inter alia, that "except as expressly permitted under the Settlement Agreement, all persons and entities shall be enjoined from

---

[14]  Funds designated "for the Breckenridge Facility, any funds required to be paid to other Parties or beneficiaries under Paragraph 7(b) or Paragraph 8, or funds in the administrative Trust Accounts" are excluded from this provision. *Id.*

making any claim against the NWI/FTL Successor, the Custodial Trust, or the Velsicol Environmental Trust Fund or the assets held therein or thereby that arose prior to the effective date of the Plan of Reorganization." S. Agmt. ¶ 21.

The Settlement Agreement was published in the Federal Register at 67 Fed. Reg. 22, 108, on May 2, 2002. The public comment period was open until July 9, 2002, and the United States held a public meeting in St. Louis on June 19, 2002, pursuant to 42 U.S.C. § 6973(d).

On June 28, 2002, St. Louis Mayor George Kubin wrote a letter to the United States, expressing concern that "the local community was never allowed to comment on or be a part of the consent agreement," although he acknowledged that a public meeting took place in St. Louis. *See* Defs. Resp. Br. Ex. A. He indicated that it was his impression that it had been announced at the meeting "that none of the funds that might be collected from the settlement will be for redevelopment of the property in St. Louis, Michigan." *Id.*

Similarly, on July 1, 2002, St. Louis City Manager Dennis Collison wrote a letter to the United States expressing concern. *Id.* His letter criticized the 1982 consent judgment entered into by Velsicol, Michigan, and the U.S. EPA whereby Velsicol agreed to construct a slurry wall and clay cap at the main plant site. *Id.* He was critical of the fact that the Pine River was not required to be remediated by the 1982 consent judgment. *Id.*

On July 25, 2002, the United States sent Plaintiff, through Mayor Kubin, notice of the United States' motion for approval of the proposed settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and under CERCLA, pursuant to 28 C.F.R. § 50.7. The United States' motion describes the city officials as "seeking a guarantee of cooperation from the Trustee, funding for needed operation and maintenance of the remedial action, cleanup of areas with low

contamination and a high potential for reuse, and governmental funding for all cleanup and operations and maintenance." The United States' motion asserts that nothing in the Settlement Agreement prevents the Custodial Trustee from providing cooperation to St. Louis, that the Settlement Agreement does not make any decisions about the response action to be implemented at the St. Louis Facility, and that nothing restricts St. Louis' ability to comment during the response selection process.

The motion for approval of the Settlement Agreement also memorializes the fact that the United States received three public comments from citizen groups or committees relating to the St. Louis Facility in St. Louis, Michigan (the Pine River Superfund Citizen Task Force, the Technical Advisory Committee for the Pine River Superfund Citizen Task Force, and the Sierra Club's Water Sentinels Project). The motion notes the following:

> The commenters . . . request that priority be given for use of funding for the St. Louis Facility for natural resource damages restoration. There is currently an investigation being conducted to determine if the previously installed containment system, a slurry wall, is leaking or if contaminants are escaping underneath the barriers that were installed. At this time, highest priority must be given to investigate and address the source of the ongoing releases and to ongoing operation and maintenance ("O&M") to prevent further releases. If there is not sufficient funding to address the ongoing releases an O&M, further natural resource damage will occur, the effectiveness of EPA's expenditure of $60 million on the Pine River cleanup that benefits natural resources would be jeopardized, and natural resource damage restoration would be threatened by the ongoing releases . . . .

> In addition, as part of the investigation/response action and O&M for the Facility, the Governments expect to include natural resource damage monitoring of the Facility that will also benefit natural resources. The United States agrees that if funding remains after the releases are addressed, the United States and States should be permitted to agree that such funding be used for natural resource damage assessment or restoration without formally amending the Agreement.

On August 9, 2002, the bankruptcy court entered an order approving the EPA Settlement Agreement, with a few clarifications. In part, the order provides that:

any distributions received by the United States with respect to its Allowed Class 4B Claim under the Plan for the St. Louis Facility shall be deposited in the Velsicol Chemical/St. Louis, Michigan Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site . . . .

It further provides that:

with respect to the St. Louis Facility, if there is any amount remaining of the funding under the Environmental Settlement Agreement which is dedicated to the St. Louis Facility after (i) response action relating to ongoing releases and (ii) ongoing operation and maintenance are each addressed or provided for, then the United States and the State of Michigan may make an appropriate allocation of the remaining funding for Natural Resource Damages with respect to the St. Louis Facility . . . .

The approval order also provides that "each and every proof of claim" against NWI, FTL, or other debtor, whether filed by the United States, its agencies, the states, their agencies, Defendant Velsicol individually, or Defendant Velsicol on behalf of another entity, was "withdrawn with prejudice and expunged, <u>except</u> for the Allowed Governmental Claims . . . ." ¶ 10 (emphasis in original). The bankruptcy court retained jurisdiction "to hear and determine all matters including, without limitation, disputes arising under the Environmental Settlement Agreement . . . or this Order." ¶ 18.

On March 19, 2007, the bankruptcy court closed the case but again retained jurisdiction "to hear and determine all matters arising under the Environmental Settlement Agreement and this Court's August 9, 2002 Order." Similarly, the Settlement Agreement provides for the bankruptcy court to:

. . . retain jurisdiction over the subject matter of this Agreement, the Parties hereto, the NWI/FTL Successor, the Custodial Trustee, and the Velsicol Fund Trustee for the duration of the performance of the terms and provisions of this Agreement for the purpose of enabling any of the Parties, the NWI/FTL Successor, the Custodial Trustee, the Velsicol Fund Trustee, and the third party beneficiaries to apply to the Court for such further order, direction, and relief as may be necessary or appropriate for the construction or interpretation of this Agreement or to effectual [*sic*] or enforce compliance with its terms.

S. Agmt. ¶ 26.

Plaintiff advances a declaration of St. Louis City Manager Robert McConkie, in which he states that "[t]he City of St. Louis first learned of the contamination of the City's wells with . . . (p-CBSA) on Friday September 23, 2005, during a meeting with [EPA representatives]." McConkie Decl. ¶ 2, Oct. 5, 2007; Mot. to Remand Ex. A. McConkie further states that "[t]he City tests its drinking water pursuant to Safe Drinking Water Act requirements, and it has relied on the expertise of the EPA and [MDEQ] to test drinking water and monitoring wells for contaminants related to the Velsicol plant site. *Id.* ¶ 3. Finally, Plaintiff advances the declaration of the director of the Environmental Studies Program at Alma College, Murray Borrello, who states that the golf course owned by Defendant Edgewood Farms contains p-CBSA contamination. Borrello Decl. ¶¶ 7-8, Oct. 8, 2007; Mot. to Remand Ex. B-1.

### III

A party seeking removal bears the burden of establishing federal subject matter jurisdiction. *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999). In their notice of removal, the Trustees and NWI-1 (in this section, "Defendants") cite the following bases for removal: (1) bankruptcy removal jurisdiction pursuant to §§ 1334(b) and 1452(a); (2) federal officer removal jurisdiction pursuant to § 1442(a); and (3) diversity jurisdiction pursuant to § 1332. Plaintiff contends that not one of the three bases for federal jurisdiction support removal to this Court.

### A

Plaintiff contends that bankruptcy jurisdiction does not exist because Plaintiff's claims do not arise under, arise in, or relate to any bankruptcy case, as necessary to establish bankruptcy jurisdiction pursuant to § 1334(b). Assuming Plaintiff's claims fall within the scope of § 1334(b),

Plaintiff contends that removal of its claims is barred by § 1452(a), because Plaintiff is a governmental entity seeking to enforce its police or regulatory power.  Finally, Plaintiff contends that this Court must or should abstain from exercising bankruptcy jurisdiction pursuant to § 1334(c) based on the state-law nature of Plaintiff's claims.

1

Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  The Sixth Circuit has recognized that "Congress intended to grant to the district courts broad jurisdiction in bankruptcy cases."  *In re Dow Corning Corp.*, 86 F.3d 482, 489 (6th Cir. 1996) (citations omitted).  When claims brought in a civil proceeding do not "arise under" Title 11, but may be "related to" a bankruptcy proceeding, the pertinent test is "whether the outcome of that [civil] proceeding could conceivably have any effect on the estate being administered in bankruptcy."  *Id.* In other words, "there must be some nexus between the 'related' proceeding and the title 11 case."  *Id.*

More specifically, "[a]n action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."  *Id.* (citations and quotations omitted).  *See, e.g.*, *Robinson v. Mich. Consol. Gas Co.*, 918 F.2d 579, 583-84 (6th Cir. 1990) (concluding that the action was "related to" a bankruptcy proceeding when the plaintiffs sued the bankruptcy trustee in his official capacity and sought recovery from the estate because "the litigation could conceivably affect the size of the . . . estate").  However, an "extremely tenuous connection" does not suffice for "related to" jurisdiction.  *Sanders Confectionery Prods. v. Heller*

*Fin., Inc.*, 973 F.2d 474, 482 (6th Cir. 1992) (quotations and citations omitted).

Plaintiff advances three primary arguments to support the proposition that this action is not "related to" a bankruptcy proceeding. First, Plaintiff contends that its claims are not related to the FTL bankruptcy because Plaintiff's claims cannot affect the administration of the bankruptcy estate when the estate has ceased to exist. Plaintiff relies primarily on *Falise v. American Tobacco Co.*, 241 B.R. 63 (E.D.N.Y. 1999), wherein the district court denied the plaintiffs' motion to vacate the dismissal of the action for lack of subject matter jurisdiction. The court explained that "[t]he mere fact that the property from a debtor's estate is transferred to a trust following the confirmation of a bankruptcy plan does not mean the bankruptcy estate itself continues to exist." *Id.* at 65. Rather, "[t]he bankruptcy estate ceases to exist upon confirmation and substantial consummation of the plan in a Chapter 11 reorganization." *Id.* Thus, the court found that bankruptcy jurisdiction did not exist because the action was not "related to" a bankruptcy action when it could not "impact[] upon the handling and administration of the bankruptcy estate." *Id.* (quotation omitted).

Second, Plaintiff contends that its claims are not "related to" the bankruptcy proceeding because they were not discharged by the FTL bankruptcy proceedings when Plaintiff was not a creditor in 2002 when the bankruptcy plan was confirmed. *See* 11 U.S.C. § 1141(d)(1)(A) ("[T]he confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation . . . ."). Plaintiff relies on Michigan law for the proposition that a toxic tort cause of action "accrues" when the plaintiff knows or should have known of the injury, citing *Henry v. Dow Chemical Co.*, 701 N.W.2d 684, 702 n.29 (Mich. 2005). Plaintiff asserts that it did not know that contaminants had reached its drinking water wells until September 2005. *See* McConkie Decl. ¶ 2. However, Plaintiff does not address whether it "should have known" of the contamination. The

correspondence of the City Manager and Mayor in June and July 2002 reflects concerns regarding environmental damage, and knowledge of the bankruptcy litigation and Settlement Agreement.

Third, and related, Plaintiff contends that its claims are not "related to" the bankruptcy proceeding because the bankruptcy plan does not bind Plaintiff when it was not a creditor of FTL. *See* 11 U.S.C. § 1141(a) ("[T]he provisions of a confirmed plan bind the debtor . . . and any creditor . . . ."). Plaintiff also contends that it is not bound by the EPA settlement agreement because the only parties to the agreement are the United States, Illinois, Michigan, New Jersey, Tennessee, FTL, NWI, Velsicol, and True Specialty Corporation. *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."). Plaintiff further contends that the EPA settlement agreement is not even "relevant" to this action because it "relates only the cleanup of Velsicol's contaminated properties and EPA's and the State's rights of reimbursement under the federal [CERCLA] . . . [and] rests on a CERCLA order entered into decades before the City discovered the contamination to its water." Plaintiff contends that this is in contrast to Plaintiff's complaint, which is "about treatment or replacement of its contaminated drinking water system, which has never been included in any cleanup plans."

In response, Defendants contend that the exhaustive nature of the Settlement Agreement and Plan "makes clear" that Plaintiff's claims are at least "related to" the FTL bankruptcy proceeding. Defendants specifically contend that the Settlement Agreement bars Plaintiff's claims, limits the use of Trust proceeds to approved claim holders in the FTL bankruptcy, limits Defendants' liability, enjoins parties from making claims against Defendants that arose prior to the plan's effective date, and provides that the bankruptcy court retains jurisdiction over the subject matter of the agreement. Defendants contend that Plaintiff's lawsuit is essentially a collateral attack on the confirmed Plan

and Settlement Agreement incorporated therein, quoting *Pratt v. Ventas, Inc.*, 365 F.3d 514, 519 (6th Cir. 2004) ("A 'collateral attack' is a tactic whereby a party seeks to circumvent an earlier ruling of one court by filing a subsequent action in another court.") (citations omitted). *See also Sanders Confectionary Prods.*, 973 F.3d at 481 (noting that "collateral attacks on confirmed plans . . . undermin[e] the necessary ability of bankruptcy courts to settle all of the claims against the debtor").

Plaintiff's claims are "related to" the FTL bankruptcy proceedings because the proceedings here could alter "rights, liabilities, options, or freedom of action" and could "impact[] upon the handling and administration of the bankrupt estate." *Robinson*, 918 F.2d at 583-84. Regardless of the notion that the estate ceased to exist upon confirmation of the Plan, Plaintiff has sued the Trustees (Lepetomane II and III) of the Successor and Custodial Trusts, which were created pursuant to the Plan, solely for the purpose of holding estate property and distributing estate assets. Lepetomane II and III are not entities that have emerged from bankruptcy to resume business operations, but creations of the bankruptcy proceedings to resolve particular creditor claims. The resources of the Custodial and Successor Trusts, of which Lepetomane II and III are the Trustees, are subject exclusively to the terms and administration of the bankruptcy court orders and the incorporated Settlement Agreement. Thus, any recovery from the funds of the Trusts would necessarily impact the administration of the bankrupt estate, and "related to" bankruptcy jurisdiction exists under § 1334(b).

2

The bankruptcy removal statute, 28 U.S.C. § 1452(a), limits the civil actions that can be removed to federal court when the only basis for federal subject matter jurisdiction is § 1334. Section 1452(a) provides:

> A party may remove any claim or cause of action in a civil action other than . . . a civil action by a governmental unit to enforce such governmental unit's police or regulatory power . . . if [the] district court has jurisdiction of such claim or cause of action under section 1334 of this title.

The parties agree that this Court should look to the "automatic stay" provision of the bankruptcy code, 11 U.S.C. § 362, to help interpret § 1452(a). *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 488 F.3d 112, 132 (2d Cir. 2007) ("As the language of the police and regulatory power exceptions in the automatic stay context and in the removal context is virtually identical, and the purpose behind each exception is the same, we think it proper to look to judicial interpretations of section 362 for guidance.") (quotations omitted).

Plaintiff contends that this action is "a civil action by a governmental unit to enforce such governmental unit's police or regulatory power." Plaintiff relies generally on *In re Javens*, 107 F.3d 359, 363 (6th Cir. 1997), wherein the Sixth Circuit clarified that under the police and regulatory power exception, the automatic stay does not operate when "a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law." *Javens*, 107 F.3d at 363 (quoting S. Rep. No. 95-989, at 52 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5838).

Plaintiff also relies on *MTBE*, 488 F.3d 112, which it contends is "indistinguishable" from the case now before the Court. In *MTBE*, the Second Circuit addressed "lawsuits originally filed by the States of California and New Hampshire in their respective state courts against corporations that manufactured, refined, marketed, or distributed gasoline containing . . . [MTBE]." 488 F.3d at 114. The complaints alleged that "MTBE contaminated public drinking water supplies through discharges, leaks, overfills, and spills from gasoline delivery facilities, as well as from the release

of gasoline in certain consumer and commercial activities." *Id.* The court found that § 1452 prevented the removal of the plaintiffs' claims, and rejected the defendants' argument that it was significant that "the government action directed against the debtor relates mainly to the protection of a pecuniary interest rather than the enforcement of regulatory police powers for the protection of the general public." *Id.* at 132-34. The court noted that any money damages "will not inure, strictly speaking, to the economic benefit of the states" because "the clear goal of these proceedings is to remedy and prevent environmental damage with potentially serious consequences for public health, a significant area of state policy." *Id.* at 133.

Plaintiff also relies on *Massachusetts v. New England Pellett, LLC*, 409 B.R. 255 (D. Mass. 2009). There, the court found that Massachusetts' complaint, consolidating many small claims under the state's consumer protection statute, was not properly removed based on § 1452. *Id.* at 258-59. The court emphasized that Massachusetts sought "injunctions, civil penalties, attorney fees and restitution." *Id.* at 259. The court reasoned that because restitution was "only one part of the relief sought," the action passed both the "public purpose" and "pecuniary purpose" tests. *Id.* at 258-59. The court also noted that the fact that Massachusetts consolidated a large number of consumer claims to deter future conduct "enhanced the conclusion" that Massachusetts was "primarily seeking to protect the public welfare." *Id.* at 259.

Defendants contend that Plaintiff is not seeking to exercise any police or regulatory power through this lawsuit because Plaintiff merely seeks monetary damages that would come from the Successor Trust. Defendants contend that Plaintiff is not seeking to regulate Defendants' behavior because Plaintiff does not allege any ongoing behavior by Defendants that is threatening public safety that is not subject to the comprehensive Settlement Agreement, nor is Plaintiff attempting to

effectuate public policy by seeking an injunction under state environmental laws.

Defendants emphasize that with respect to § 362, the Sixth Circuit has acknowledged that "there are two tests for determining whether an action by a governmental unit falls within the automatic stay or is excepted under the 'police power' exception: the pecuniary purpose test and the public policy test." *In re Commerce Oil Co.*, 847 F.2d 291, 295 (6th Cir. 1988). First, "[u]nder the pecuniary purpose test, reviewing courts focus on whether the governmental proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's property, and not to matters of public safety." *Id.* Second, "[u]nder the public policy test, reviewing courts must distinguish between proceedings that adjudicate private rights and those that effectuate public policy." *Id.* Under either test, the exception does not apply "if the state [i]s seeking a monetary sum merely as collection of a debt or as compensation for reclamation it had already performed." *Id.*

In *Commerce Oil*, the Sixth Circuit found that Tennessee's assessment of penalties and review of those damages under the Tennessee Water Quality Control Act, Tenn. Code § 69-3-101 et seq. were excepted from the automatic stay under the "police power" exception. *Id.* at 294-97. The court explained that "the rationale, policy and factors expressed in the . . . Act [were not] based upon the state's ownership of or pecuniary interest in the natural resources of Tennessee." *Id.* at 296. The court explained that the purposes of the Act included "[p]unishing wrongdoers, deterring illegal activity, recovering remedial costs of damage to the environment, providing for the costs of administration and weighing the social and economic value of a discharge source" which "are exercises of the state's regulatory power to effectuate public policy and are not actions based upon the state's property interests." *Id.* "Likewise removing, correcting or terminating pollution and determining the severity and effect of discharges on the receiving waters are actions to protect the

public health and safety, and are not grounded upon the state's property interests." *Id.*

While Plaintiff asserts that the purpose of this action "is to remedy the contamination of the public water supply and to prevent and protect its citizens from further contamination, not to protect its pecuniary interest," Plaintiff has repeatedly emphasized that "this case is an action brought by an injured property owner." In particular, the complaint refers several times to Plaintiff's "property interest" in the water that it appropriates and its water system. *See, e.g.*, Compl. ¶¶ 6, 34, 48, 54. Additionally, Plaintiff seeks an award of exemplary damages against Velsicol. *Id.* ¶¶ 32, 57, 66, 74. Although Plaintiff seeks compensation for "response costs," *id.* ¶¶ 1, 34, 46, Plaintiff does not seek injunctive relief or civil penalties.

Moreover, none of Plaintiff's claims are unique to its status as a governmental entity. Even though Plaintiff may aim to remedy environmental damage that has a clear adverse health effect, Plaintiff's claims of nuisance, trespass, and negligence are claims that any person could bring for those torts, regardless of the environmental consequence. Similarly, Plaintiff's NREPA claims are available to the State or "any other person." Mich. Comp. Laws § 324.20126a(7). *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 247 F.R.D. 420, 426 (S.D.N.Y. 2007) ("It would make no sense to hold that a tort claim filed by a private entity seeking compensatory and punitive damages enforces 'police or regulatory' powers when filed by a governmental unit that has also alleged property damage.").

Based on the above, the governmental enforcement exception embodied in § 1452(a) does not apply and bankruptcy removal jurisdiction exists. The exception also does not apply because, as will be discussed below, § 1442 provides an alternative basis for removal jurisdiction. Even if the exception were to apply, however, its application may have been waived by Plaintiff because

its motion to remand was filed thirty-eight days after Defendants removed the case.  For example, in *Orange County Water District v. Unocal*, the court explained that because § 1334(b) confers subject matter jurisdiction and § 1452(a) is merely a procedural mechanism by which removal is effected, a § 1452(a) challenge is waivable.  522 F. Supp. 2d 557, 567-68 (S.D.N.Y. 2007) ("If § 1452(a) challenges are not raised within thirty days, we will consider them waived pursuant to § 1447(c).").

## 3

Under§ 1334(c), when subsection (b) provides the only ground for federal subject matter jurisdiction, and a timely motion is filed by "a party in a proceeding based upon a State law claim . . . related to a case under title 11 . . . the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction."  *Id.* § 1334(c)(2).  Similarly, a district court may abstain "from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11" if doing so is "in the interest of justice, or in the interest of comity with State courts or respect for State law."  *Id.* § 1334(c)(1).

"For mandatory abstention to apply, a proceeding must: (1) be based on a state law claim or cause of action; (2) lack a federal jurisdictional basis absent the bankruptcy; (3) be commenced in a state forum of appropriate jurisdiction; (4) be capable of timely adjudication; and (5) be a non-core proceeding."  *In re Dow Corning Corp.*, 86 F.3d at 497.  "Mandatory abstention under section 1334(c)(2) is not jurisdictional and must be raised in a timely motion."  *Robinson*, 918 F.2d at 584.  The central issue raised by the parties' papers is whether this action is a "core proceeding."

Core proceedings include, inter alia, "matters concerning the administration of the estate,"

28 U.S.C. § 157(b)(2)(A), "orders to turn over property of the estate," *id.* § 157(b)(2)(E), and "other proceedings affecting the liquidation of the assets of the estate," *id.* § 157(b)(2)(O). Subsection 157(b)(3) provides that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." *Id.* § 157(b)(3). The Sixth Circuit has explained that "[a] core proceeding either invokes a substantive right created by federal bankruptcy law or one which could not exist outside of the bankruptcy." *In re Lowenbraun*, 453 F.3d 314, 320 (6th Cir. 2006) (quoting *Sanders Confectionary Prods.*, 973 F.2d at 482).

Plaintiff contends that this action is a non-core proceeding because the issues raised by the complaint rest solely on Michigan law. Plaintiff contends that the issues do not invoke any provision of the bankruptcy code and do not fall within the specifically enumerated categories of core proceedings in § 157(b). Plaintiff emphasizes that in *Lowenbraun*, the Sixth Circuit cited *In re DeLorean Motor Co.*, 155 B.R. 521, 525 (B.A.P. 9th Cir. 1993) for its "holding that even if a claim fits within the literal language of § 157(b)(2), it will not be considered a core proceeding 'if it is a state law claim that could exist outside of bankruptcy and is not inextricably bound to . . . a right created by the Bankruptcy Code.' " 453 F.3d at 320. The Sixth Circuit noted that *DeLorean* was interpreting *Northern Pipeline*, 458 U.S. 50.

Plaintiff cites *Northern Pipeline*, 458 U.S. at 71-72, for the proposition that a state common law action for damages is "categorically" a non-core proceeding. In *Northern Pipeline*, the Court concluded that "the assignment by Congress to bankruptcy judges of the jurisdiction granted in 28 U.S.C. § 1471 (1976 ed., Supp. IV) by § 241(a) of the Bankruptcy Act of 1978 violates Art. III of the Constitution." 458 U.S. at 52. The 1978 Act granted the new bankruptcy courts "jurisdiction over all 'civil proceedings arising under title 11 [the Bankruptcy title] or arising in or *related to*

cases under title 11.' " *Northern Pipeline*, 458 U.S. at 54 (quoting 28 U.S.C. § 1471(b) (1976 ed.,

Supp. IV)) (alteration and emphasis in opinion).  By way of background, Northern Pipeline filed a

petition for reorganization in the U.S. Bankruptcy Court for the District of Minnesota, and then filed

a suit in that court against Marathon Pipe Line seeking "damages for alleged breaches of contract

and warranty, . . . as well as for alleged misrepresentation, coercion, and duress." *Id.* at 56.

Subsequently, "Marathon sought dismissal of the suit, on the ground that the Act unconstitutionally

conferred Art. III judicial power upon judges who lacked life tenure and protection against salary

diminution." *Id.* at 56-57.

    In the portions of *Northern Pipeline* cited by Plaintiff, the Court addressed whether the newly

established bankruptcy courts were valid as "legislative courts." *Id.* at 63-76.  The Court explained

that controversies involving "public rights," as opposed to "private rights" "may be removed from

Art. III courts and delegated to legislative courts or administrative agencies for their determination."

*Id.* at 70 (citations omitted).  While "the liability of one individual to another under the law as

defined is a matter of private rights," "a matter of public rights must at a minimum arise 'between

the government and others.' " *Id.* at 69-70 (quotations and citations omitted).  The Court explained

that private rights disputes, unlike public rights disputes, cannot be delegated to legislative courts

because they "lie at the core of the historically recognized judicial power." *Id.* at 70.

    In the bankruptcy context, the Court acknowledged that "the restructuring of debtor-creditor

relations, which is at the core of the federal bankruptcy power . . . may well be a 'public right,' " but

"the adjudication of state-created private rights, such as the right to recover contract damages . . .

obviously is not." *Id.* at 71.  Although Northern Pipeline's claim for contract damages "may be

adjudicated in federal court on the basis of its relationship to the petition for reorganization . . . this

relationship does not transform the state-created right into a matter between the Government and the petitioner for reorganization." *Id.* at 72 n.26. In other words, the private right, involving "the liability of one individual to another under the law defined" is not transformed into a "public right." *Id.* at 72. Finally, the Court emphasized that "[e]ven in the absence of the federal [bankruptcy] scheme, the plaintiff would be able to proceed against the defendant on the state-law contractual claims." *Id.* at 72 n.26. Thus, the Court concluded that the delegation of duties to the bankruptcy courts could not be considered a constitutional delegation of "public rights" disputes to "legislative courts." *Id.* at 63-76.

Significantly, it is not apparent how *Northern Pipeline* supports the proposition advocated by Plaintiff, that the action now before the Court is a non-core proceeding simply because the issues raised by the complaint rest solely on Michigan law. Plaintiff has not provided an explanation, and simply emphasizes the following language from *Northern Pipeline*, "Even in the absence of the federal scheme, the plaintiff would be able to proceed against the defendant on the state-law contractual claims." *Id.* at 72 n.26. Presumably, Plaintiff's point is that its state-law claims are independent from the bankruptcy proceeding and could be pursued by Plaintiff regardless of whether FTL ever pursued a bankruptcy petition. Plaintiff may also implicitly advance the proposition that "the restructuring of debtor-creditor relations, . . . is at the *core* of the federal bankruptcy power" while the "liability of one individual to another under the law defined" is not. *Id.* at 71-72 (emphasis added).

Significantly, Congress only enacted § 157 in 1984, defining "core proceedings," as a result of the invalidation of the prior bankruptcy scheme by *Northern Pipeline*. *See generally In re Baldwin-United Corp.*, 52 B.R. 541, 545 (Bankr. S.D. Ohio 1985) ("When the narrow holding of

[*Northern Pipeline*] is read in combination with pertinent provisions of the 1984 Amendments, we conclude that the primary intent of Congress was not to divest the Bankruptcy Court of all authority to adjudicate state law claims; rather, it was to create a system which meets the constitutional need for vesting the 'essential attributes of judicial power' . . . in an Article III Court while also meeting the practical need for an adjunct to assist the District Court in exercising that jurisdiction as to matters arising under both state law and bankruptcy law.").

Plaintiff also cites *In re John Richards Homes Building Co.*, 405 B.R. 192, 210-11 (E.D. Mich. 2009), to support the proposition that the action now before the Court is not a core proceeding. There, the court stated: "Examples of core proceedings that arise after a bankruptcy case is dismissed or closed include awards of costs, attorney's fees, damages, punitive damages and sanctions." *Id.* at 210. The court concluded that the party's application for attorney fees was a core proceeding because it arose from "the judgment issued by the Bankruptcy Court, which was clearly a core proceeding, and it is inextricably intertwined with the bankruptcy case itself." *Id.* at 211. Without substantial explanation, Plaintiff contends that the cited case supports a conclusion that the case before the Court is not a core proceeding because "Plaintiff's common law and state statutory claims arose after and are not related to the prior bankruptcy and certainly cannot be characterized as 'inextricably intertwined.' "

In response, Defendants contend that this action is a core proceeding even though Plaintiff's claims could exist outside bankruptcy, because they will potentially affect the administration of the estate. *See* § 157(b)(2)(A). Defendants emphasize that in *Lowenbraun*, a case cited by Plaintiff, the court concluded that a state-law action may be a core proceeding under § 157(b)(2), even after a bankruptcy estate is closed, if the action would not have arisen but for the existence of the

bankruptcy. 453 F.3d at 321.

In *Lowenbraun*, the bankruptcy trustee retained an attorney to investigate whether the debtor had made improper transfers of assets from the bankruptcy estate to his wife; and the attorney eventually brought contempt proceedings against the debtor and his wife. *Id.* at 317. Subsequently, the debtor's wife filed a civil action in state court, asserting claims for various state-law torts against the attorney for the bankruptcy trustee, who removed the action to the federal bankruptcy court. *Id.* Ultimately, on appeal, the Sixth Circuit affirmed the bankruptcy court's decision that mandatory abstention was not applicable to the claims of the debtor's wife. *Id.* at 317, 321. The court concluded that the claims "would not exist but for the bankruptcy proceeding, and because [the attorney for the bankruptcy trustee] filed the Contempt Motion to assist in the administration of the estate, [the debtor's wife's] state-law action was a core proceeding, thus precluding mandatory abstention." *Id.* at 321.

Defendants also rely on *Baldwin-United Corp.*, 52 B.R. at 548, wherein the bankruptcy court noted that "Congress did not intend that mandatory abstention could be manufactured through a flagrant violation of the automatic stay" when a defendant commenced an action in state court in an attempt to meet the requirement that "an action is commenced, and can be timely adjudicated in a State forum." Defendant asserts that, here, Plaintiff waited to bring its complaint until after the bankruptcy closed, and that conduct is akin to the situation in which a plaintiff brings a post-petition suit in state court in violation of an automatic stay and seeks to keep it there on abstention grounds.

Finally, Defendants contend that the exhaustive nature of the EPA settlement agreement and plan "makes clear" that Plaintiff's claims are core proceedings because the EPA settlement agreement bars Plaintiff's claims, limits the use of Trust proceeds to approved claim holders in the

FTL bankruptcy, limits Defendants' liability, enjoins parties from making claims against Defendants that arose prior to the plan's effective date, and provides that the bankruptcy court retains jurisdiction over the subject matter of the agreement. Once again, Defendants contend that Plaintiff's lawsuit is essentially a "collateral attack" on the confirmed plan and EPA settlement agreement incorporated therein, quoting *Pratt*, 365 F.3d at 519.

What is even more significant is that the Trusts were created to administer the bankruptcy estate. While Plaintiff places much emphasis on the fact that its claims may not have been discharged and may not have been addressed through the bankruptcy proceeding, depending on when they arose, Plaintiff ignores the fact that it has sued the Trustees, whose sole purpose and reason to be is to administer the estate. The Trusts are creatures of bankruptcy and would not exist but for the bankruptcy proceedings. In other words, Plaintiff's claims against Lepetomane II and III are inextricably intertwined with the bankruptcy proceeding, and constitute a "core proceeding." Thus, mandatory abstention does not apply to this case. Mandatory abstention also does not apply because, as will be discussed below, § 1442 provides an alternative basis for federal jurisdiction.

Even if mandatory abstention does not apply, Plaintiff contends that this Court should exercise its discretion to abstain under § 1334(c)(1). Plaintiff cites a list of possible factors to consider:

> (1) the effect or lack thereof on the efficient administration of the estate if a court recommends abstention; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of the applicable law; (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted core proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden of the bankruptcy court's docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by

one of the parties; (11) the existence of a right to a jury trial; and (12) the presence in the proceeding of non-debtor parties.

*Delphi Automotive Sys., LLC v. Segway, Inc.*, 519 F. Supp. 2d 662, 670-71 (E.D. Mich. 2007) (quoting *Beneficial Nat'l Bank USA v. Best Receptions Sys., Inc.*, 220 B.R. 932, 953 (Bankr. E.D. Tenn.1998)). Plaintiff contends that "the most obvious and compelling factors" are that this case will not affect the administration of the bankruptcy estate; the case involves only state law issues; and FTL, the debtor, is not a party to the case. Plaintiff contends that whether the Trusts may be liable to third-party creditors for claims that arose after the Plan was consummated will have no effect on the Plan or the estate. Finally, Plaintiff continues to maintain that jurisdiction is not proper under other federal statutes.

In response, Defendants contend, inter alia, that this case will hinder the administration of the estate because of the Trustees' inability to allocate funds as required under the Settlement Agreement; that bankruptcy issues predominate because of the possible effects on the Plan, the Settlement Agreement, the Trust Agreements, and the Trust beneficiaries; that the Trustees were created as part of the bankruptcy proceeding and Velsicol is a party to the Settlement Agreement; and that jurisdiction exists under other statutes.

While it is possible that the Court could elect to abstain from hearing this case based on the state-law nature of Plaintiff's claims, it is important to reiterate that Lepetomane II and III and NWI-1 operate subject to, if not solely as a creation of, the earlier bankruptcy proceedings. A concern for comity or deference to state court expertise on state law is unavailing where significant bankruptcy questions will inform on the progress of the litigation. Thus, the Court will not exercise discretion to abstain.

B

The federal officer removal statute, 28 U.S.C. § 1442(a)(1), provides, in relevant part, that a civil action may be removed from state court if it is commenced against:

> The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

For removal to be proper, a defendant "must both raise a colorable federal defense, and . . . show a nexus, a 'causal connection' between the charged conduct and asserted official authority." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (quotations and citations omitted). A private party defendant must also demonstrate that the party acted under the direction of a federal officer or agency. *Watson v. Phillip Morris Co., Inc.*, 551 U.S. 142, 151 (2007). The U.S. Supreme Court has explained that "[t]he words 'acting under' are broad, and . . . the statute must be 'liberally construed,' " although "broad language is not limitless." *Id.* at 147.

Narrower versions of the statute have existed since "near the end of the War of 1812." *See generally id.* at 147-51 (describing the history of the statute). As far back as 1880, the Court found that removal by federal officers and agents "would help to prevent hostile States from 'paralyzing' the Federal Government and its initiatives." *Id.* at 149 (citing *Tennessee v. Davis*, 100 U.S. 257, 263 (1880)). In addition, "[s]tate-court proceedings may reflect 'local prejudice' against unpopular federal laws or federal officials." *Id.* at 150 (citing *Maryland v. Soper*, (No. 1), 270 U.S. 9, 32 (1926)).

In *Watson*, the Supreme Court rejected the Philip Morris Companies' argument that removal was proper under § 1442 on the basis of heavy regulation by the Federal Trade Commission of testing and labeling cigarettes. 551 U.S. 142. The Court concluded that "the fact that a federal

regulatory agency directs, supervises, and monitors a company's activities in considerable detail" does not bring the company "within the scope of . . . 'acting under' an 'officer' of the United States." *Id.* at 145 (emphasis in original). The Court explained that a "private person's 'acting under' must involve an effort to *assist* or to help *carry out*, the duties or tasks of the federal supervisor." *Id.* at 152 (citations omitted and emphasis in original). Such effort "does *not* include simply *complying* with the law." *Id.* (emphasis in original).

The Court specifically distinguish *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998), because in that case, the chemical companies "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 154. The private companies contracted with the government to produce "a specific mixture of herbicides, which eventually became known as Agent Orange." *Winters*, 149 F.3d at 398. The contract specified the precise mixture of ingredients, and requirements for packaging, labeling, and shipping, and the government was involved with "ongoing supervision." *Id.* at 398-400. On those facts, the government exercised "direct control . . . over the composition and production of Agent Orange." *Id.* at 398. In contrast, in *Watson*, the Court found that there was "no evidence of any delegation of legal authority from the FTC to the industry association to undertake testing on the Government agency's behalf." *Id.* at 156.

In this case, Plaintiff contends that there is no causal connection between any federal directive and Plaintiff's allegations in the complaint. Plaintiff asserts that there is no formal delegation of power from the government and Defendants are not contractually bound to produce any item for an important government need. Rather, Plaintiff asserts that the Trusts were simply created to manage assets on behalf of several beneficiaries, one of which happens to be the EPA.

In order to show the requisite causal connection, Plaintiff asserts that Defendants would need to demonstrate that the government has specifically directed the Trusts not to treat or replace contaminated wells. *See Jefferson County*, 527 U.S. at 432 (stating that a defendant "must demonstrate that the acts for which they are being sued . . . occurred *because of* what they were asked to do by the Government") (emphasis in original); *MTBE*, 488 F.3d at 124-25 ("Critical under the statute is to what extent defendants acted under federal direction at the time they were engaged in the conduct now sued upon.") (quotations omitted); *Freiberg v. Swinerton & Walberg Prop. Servs., Inc.*, 245 F. Supp. 2d 1144, 1152 (D. Colo. 2002) ("The official must have direct and detailed control over the defendant."); *Arness v. Boeing N. Am., Inc.*, 997 F.Supp. 1268, 1275 (C.D. Cal. 1998) (finding an insufficient causal connection when the government may have directed production activities but plaintiff's claims were based on disposal activities and the government did not restrict the defendant's ability to implement safeguards for disposal); *MTBE*, 488 F.3d at 126-27 (finding insufficient causal connection when regulation did not specifically compel use of MTBE as an additive when the defendant did not allege that the government was aware that it was the only approved additive actually available in the market); *Guillory v. Ree's Contract Serv., Inc.*, 872 F.Supp. 344, 347 (S.D. Miss. 1994) (finding insufficient causal connection when vague directions from the government such as "maintain law and order" only established "basic parameters" rather than "direct and detailed control").

Defendants contend that the requisite causal connection exists in this case because the Trusts act under the directive of the EPA and are subject to the EPA's monitoring and control. Defendants emphasize that the Trusts' conduct with respect to the Velsicol St. Louis facility "involves an effort to assist, or help carry out, the duties or tasks" of the EPA, beyond the effort that would simply be

required of a heavily regulated party.  At the first hearing, defense counsel emphasized that the Trusts hold "money and assets that the EPA could have received directly from the Bankruptcy Court as approved claimant then done the work themselves.  Instead they decided to create these two trusts, retain control over these two trusts."  Hr'g Tr. 43, Jan. 23, 2008.  Counsel emphasized that the creation of the Trusts allows the parties to work together with an "independent trustee," to have "the benefits of the bankruptcy discharge injunction and the discharge apply," and to avoid comingling with the Superfunds and to create "separate and distinct accounts for each site and yet it leaves the EPA in control."  Hr'g Tr. 44.  The shareholder of the trustee, Jay Steinberg, stated that "everything I do is subject to the EPA.  The trusts are very very constricting from the point of view that I can make recommendations, but I have to have the approval of the EPA.  And in many cases I have to have the approval of the EPA and the state government."  Hr'g Tr. 7.

Defendants have advanced facts that demonstrate that the federal government exercises "direct and detailed" control over the Trusts.  While Plaintiff characterizes the EPA as simply a beneficiary of the Trust, the EPA is also involved in overseeing, monitoring, and approving management of the assets and properties held by the Trusts.  Moreover, had the parties to the Settlement Agreement not entered that agreement, the EPA would have been obligated to use the any funds recovered to fund cleanup efforts and would have been responsible for the cleanup under CERCLA.  Thus, the Trust is properly characterized as assisting the EPA to perform a task that the government would otherwise be obligated to perform absent the agreement.

Plaintiff also asserts that removal is improper under § 1442 because Defendants lack a colorable federal defense.  Plaintiff contends that Defendants lack a federal defense because Plaintiff's claims are not barred by the bankruptcy proceedings, contribution protection provisions

of the Settlement Agreement, or other payment provisions of the Settlement Agreement and related orders. Plaintiff asserts that a defense arising from those arguments is not colorable because Plaintiff's claims did not arise until well after the Plan was confirmed, Plaintiff was not a party to the bankruptcy and it is not a party to the contracts signed between the parties, Plaintiff's common law and state statutory claims regarding its drinking water are not CERCLA contribution claims, and are not covered by any of the bankruptcy documents, and the contract provisions purporting to prevent third party claims are unenforceable.

While Plaintiff argues the merits of the defense, "one of the most important purposes for removal is to have the validity of a federal defense . . . tried in federal court." *Jefferson County*, 527 U.S. at 431. Plaintiff has not argued that the Trustees were acting, or failing to act, outside their authority under the Trusts to manage the assets and properties of the Trusts. Thus, Defendants have a colorable federal defense. Based on the above, removal is proper pursuant to § 1442.

## C

The federal diversity jurisdiction statute permits a federal district court to exercise subject matter jurisdiction over actions for more than $75,000 when the citizenship of each plaintiff is diverse from the citizenship of each defendant. § 1332(a)(1); *see also Glancy v. Taubman Ctr., Inc.*, 373 F.3d 656 (6th Cir. 2004) (citing *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 (1996)). When an action is filed in state court, a defendant may remove the case to federal district court if diversity jurisdiction exists. 28 U.S.C. § 1441. Significantly, a plaintiff's "fraudulent joinder of non-diverse defendants will not defeat removal on diversity grounds." *Coyne*, 183 F.3d at 493.

However, if the plaintiff has joined a non-diverse defendant and there is no other basis for federal subject matter jurisdiction, a removing defendant must show that joinder of the non-diverse

defendant was fraudulent, in order to avoid remand. *Jerome-Duncan, Inc. v. Auto-By-Tel, LLC.*, 176 F.3d 904, 907 (6th Cir. 1999) (citation omitted). "To prove fraudulent joinder, the removing party must present sufficient evidence that a plaintiff could not have established a cause of action against non-diverse defendants under state law." *Coyne*, 183 F.3d at 493 (citing *Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 949 (6th Cir. 1994)). The action must be remanded to state court "if there is a colorable basis for predicting that a plaintiff may recover against non-diverse defendants." *Id.* Notably, "all disputed questions of fact and ambiguities in the controlling . . . state law" must be resolved in favor of the non removing party. *Id.* (quoting *Alexander*, 13 F.3d at 949). Finally, the plaintiff's motivation for joining any non-diverse defendants is immaterial to the fraudulent joinder analysis. *Jerome-Duncan*, 176 F.3d at 907.

Plaintiff has alleged claims for trespass, nuisance, and negligence under Michigan common law against Edgewood Farms *See* Compl. ¶¶ 47-74. First, Defendants contend that there is no reasonable basis for concluding that Edgewood Farms could be liable in trespass, because a trespass claim requires "proof of an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession." *Adams v. Cleveland-Cliffs Iron Co.*, 602 N.W.2d 215, 222 (Mich. Ct. App. 1999).

Defendants contend that Plaintiff has not alleged that p-CBSA, the only chemical claimed to have reached Plaintiff's wells, has been discovered on Edgewood Farms' property; and therefore, p-CBSA could not have intruded on Plaintiff's property from there. Defendants also contend that sampling conducted by Michigan confirms that p-CBSA was only detected on lands owned by entities other than Edgewood Farms. *See* Notice of Removal Ex. J (Nov. 2006 Remedial Investigation Report). Most recently, Defendants submitted an affidavit of a professional

groundwater hydrogeologist and geochemist, who explains his opinion that "[t]he Former Burn-pit Area and Golf Course are not a source of the p-CBSA that is reported in the City wells."  Hennet Aff. ¶ 4, Feb. 3, 2010

While Defendants' reading of the complaint is fair, Plaintiff disputes Defendants' characterization.  Plaintiff highlights that it has alleged that Edgewood Farms is the owner of a "Contaminated Site," which is defined as a place where chemicals including p-CBSA can be found. *See* Compl. ¶¶ 3, 11.  In addition, Plaintiff advances a declaration of Murray Borrello, stating that "the property outside of the "Burn Pit" that contains pCBSA . . . is the current Hidden Oaks Golf Course owned by 'Edgewood Farms, Inc.' "  Borrello Decl. ¶ 8.  While Defendants advance evidence to dispute whether the well identified in Mr. Borrello's declaration is on Edgewood Farm's property, *see* Notice of Removal Exs. K & L (title records and property survey), Plaintiff contends that even if the well is twenty feet away from Edgewood Farms' property line, it is virtually certain that p-CBSA is contained throughout Edgewood Farms' property because it had to migrate through the property from the source in order to reach that well.  Borrello Decl. ¶ 9.

Defendants also contend that Plaintiff does not have exclusive ownership or possession of the groundwater, citing *U.S. Aviex Co. v. Travelers Ins. Co.*, 336 N.W.2d 838, 843 (Mich. Ct. App. 1983) (affirming trial court's ruling that "damage to the groundwater beneath plaintiff's property" was not within an insurance policy exclusion for "property owned by the insured" because "percolating water is not owned by the owner of the land under which it flows").  At the same time, Defendants contend that chemicals that contaminate ground water are "intangible objects" and not subject to trespass claims.  *See Postma v. County of Ottawa*, No. 243602, 2004 WL 1949317, at *9 (Mich. Ct. App. 2004) (per curiam) (concluding in dicta that "contaminants in groundwater, even

more so than dust that settles on land, simply becomes 'a part of the ambient circumstances of that space' and will not support an action in trespass") (quoting *Adams*, 602 N.W.2d at 223).

Second, and similarly, Defendants contend that there is no reasonable basis to conclude that Edgewood Farms could be liable for Plaintiff's negligence claim because Plaintiff must demonstrate a "present physical injury" to its property caused by Edgewood Farms before Edgewood Farms may be held liable. *Henry v. Dow Chem. Corp.*, 701 N.W.2d 684, 690 (Mich. 2005). Defendants and Plaintiff reiterate their arguments regarding whether Plaintiff has alleged that p-CBSA has been discovered on Edgewood Farms' property and whether any evidence suggests that p-CBSA is on Edgewood Farms' property and could have migrated to Plaintiff's property from there.

Third, with respect to Plaintiff's nuisance claim, Defendants emphasize that Plaintiff did not allege that Edgewood Farms caused any contamination, used any of the chemicals, was aware of any further disposal activities on its property after it bought the land, consented to disposal on its property, or buried, discharged, disposed of, burned or otherwise released chemicals into the environment. Rather, Plaintiff alleges that Edgewood Farms purchased land that was already contaminated and asserts that Edgewood Farms should have remediated the chemicals. Compl. ¶ 52. Defendants contend that Edgewood Farms could not have abated any nuisance, given that groundwater contamination would have migrated from the burn pit area and lands owned by others. In light of these facts, Defendants contend that Plaintiff cannot demonstrate that Edgewood Farms was the legal cause of the harm, citing *Adkins v. Thomas Solvent Co.*, 487 N.W.2d 715, 720 (Mich. 1992).

In addition, Defendants contend that Plaintiff has not sufficiently supported its position that liability for a nuisance may be imposed on a property owner who played no role in disposal activities

that occurred in the relatively distant past. Defendants contend that in the cases cited by Plaintiff, *Radloff v. State of Michigan*, 323 N.W.2d 541, 542-43 (Mich. Ct. App. 1982), and *Sanford v. City of Detroit*, 371 N.W.2d 904, 905-06 (Mich. Ct. App. 1985), the nuisances could easily have been abated.

With respect to each of its trespass, negligence, and nuisance claims, Plaintiff relies on the Restatement (Second) of Torts § 839, for the proposition that liability can attach to actors who did not create a dangerous condition if they have knowledge of the condition and fail to abate it. Section 839 provides:

> A possessor of land is subject to liability for a nuisance caused while he is in possession by an abatable artificial condition on the land, if the nuisance is otherwise actionable, and
>
> > (a) the possessor knows or should know of the condition and the nuisance or unreasonable risk of nuisance involved, and
> >
> > (b) he knows or should know that it exists without the consent of those affected by it, and
> >
> > (c) he has failed after a reasonable opportunity to take reasonable steps to abate the condition or to protect the affected persons against it.

Plaintiff also highlights Comment d to § 839, entitled, "Liability for failure to act," which states in part:

> This Section states circumstances in which a possessor of land is liable for failure to take affirmative action to protect another against harmful physical conditions on the possessor's land. His liability is not based upon responsibility for the creation of the harmful condition, but upon the fact that he has exclusive control over the land and the things done upon it and should have the responsibility of taking reasonable measures to remedy conditions on it that are a source of harm to others.

The crux of whether Defendants can demonstrate that Plaintiff cannot recover on its claims against Edgewood Farms turns on whether nuisance, trespass, or negligence can be predicated on an omission, i.e., Edgewood Farms' purported failure to contain or abate an allegedly known contamination to its property. At this juncture, Defendants have not demonstrated that Michigan

law does not allow for a failure to act as a predicate for liability on nuisance, trespass, or negligence claims. There is at least ambiguity as to whether Edgewood Farms's alleged knowledge and inaction could suffice for Plaintiff to recover against Edgewood Farms for the alleged incursion of p-CBSA in Plaintiff's water supply.

Additionally, the parties' attempts to provide scientific evidence regarding whether the contaminant is, in fact, present on Defendant Edgewood Farms's property is indeterminate. While the evidence advanced by Defendants to demonstrate that contamination has not arrived at Plaintiff's wells from Edgewood Farms' property may be more compelling than the contrary evidence advanced by Plaintiff at this juncture, such a disputed fact issue does not overcome a "colorable basis" for Plaintiff's claims, particularly when discovery has not yet taken place. Thus, resolving "all disputed questions of fact and ambiguities in the controlling . . . state law" in favor of Plaintiff, Defendants have not proven that Plaintiff fraudulent joined Edgewood Farms. Thus, diversity jurisdiction does not exist.

## D

Based on the above, Plaintiff's motion to remand will be denied because bankruptcy removal jurisdiction exists pursuant to §§ 1334(b) and 1452(a), Defendants are not barred from removing the case based on the regulatory or police power exception to § 1452(a), and mandatory or permissive abstention under § 1334(c) does not apply. In addition, federal officer removal jurisdiction exists under § 1442(a). While diversity jurisdiction does not exist pursuant to § 1332, it is not necessary, in light of jurisdiction under §§ 1334(b) and 1452(a), and § 1442(a).

## IV

Rule 24 of the Federal Rules of Civil Procedures governs both intervention as of right, Fed.

R. Civ. P. 24(a), and permissive intervention, Fed. R. Civ. P. 24(b). Generally, Rule 24 should be "broadly construed in favor of potential intervenors." *Stupak-Thrall v. Glickman*, 226 F.3d 467, 472 (6th Cir. 2000) (quoting *Purnell v. Akron*, 925 F.2d 941, 950 (6th Cir. 1991)). In its motion to intervene, the United States asserts that it has a right to intervene, and in the alternative, that permissive intervention is appropriate.

Under Rule 24(a), the Court "must permit anyone to intervene who":

(1) is given an unconditional right to intervene by a federal statute; or

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a). Consistent with the text of the rule, a proposed intervenor must establish the following four factors in order to intervene as of right:

(1) the motion to intervene is timely; (2) the proposed intervenor has a substantial legal interest in the subject matter of the case; (3) the proposed intervenor's ability to protect their interest may be impaired in the absence of intervention; and (4) the parties already before the court cannot adequately protect the proposed intervenor's interest.

*Coal. to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007) (citing *Grutter v. Bollinger*, 188 F.3d 394, 397-98 (6th Cir. 1999)).

First, "[t]he determination of whether a motion to intervene is timely 'should be evaluated in the context of all relevant circumstances.' " *Stupak-Thrall*, 226 F.3d at 472-73 (quoting *Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir.1990)). The Sixth Circuit has considered five specific factors particularly relevant to whether a motion is "timely":

(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they

knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Stupak-Thrall*, 226 F.3d at 473 (quoting *Jansen*, 904 F.2d at 340).  The United States emphasizes that Defendants' notice of removal was filed on August 31, 2007, that Plaintiff's motion to remand was filed on October 8, 2007, and that the United States' motion to intervene was filed on December 14, 2007.  The initial briefing of Plaintiff's motion to remand was only completed on November 30, 2007.  Also, the case has progressed very little down the "litigation continuum"; in particular, discovery has not yet taken place.

Second, with respect to a "substantial interest," the Sixth Circuit "has opted for a rather expansive notion of the interest sufficient to invoke intervention of right."  *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997) (citations omitted).  "The inquiry into the substantiality of the claimed interest is necessarily fact-specific."  *Id.*  The United States asserts that it has a substantial legal interest in the subject matter of the underlying case, the Successor and Custodial Trusts.  The United States emphasizes that it was a party to the Settlement Agreement that established the two trusts, and was a major claimant in the bankruptcy action that resulted in the Bankruptcy Order approving the Settlement Agreement.  Along with the State of Michigan, the United States is a named beneficiary of the trusts, which are holding assets in trust for funding or reimbursing response actions under CERCLA at certain sites under the Agreement.

Third, the burden to show that a movant's interest may be impaired absent the intervention is "minimal"– the proposed intervenor need only show that impairment is possible.  *Mich. State AFL-CIO*, 103 F.3d at 1247.  The Sixth Circuit has noted that potential negative stare decisis effects can be the basis for impairment.  *Ne. Ohio Coal. for the Homeless*, 467 F.3d at 1008.  The United States acknowledges that it would not be legally bound by a judgment in its absence, but asserts that

a negative judgment would "as a practical matter" impair its interests because Plaintiff seeks to hold the Successor and Custodial Trusts liable for response costs related to removing alleged contamination from its drinking water supplies. *See New Orleans Pub. Serv., Inc. v. United Gas Line Co.*, 732 F.2d 452, 463 (5th Cir. 1984).

The United States asserts that the outcome of any one of the following issues could adversely affect the United States' interests in protecting the integrity of the Successor and Custodial Trusts, and could have stare decisis force:

• How could monies in the Trust accounts legally fund or reimburse response actions for the benefit of an entity (the City) that was not a party to the Settlement Agreement and that is not a beneficiary of the Trusts, contrary to the intent and language of the Settlement Agreement, the Trust Agreements and the Bankruptcy Court Order?

• How could monies in the Trust accounts legally fund or reimburse response actions that were not selected or approved by the United States and/or the relevant State, contrary to the intent and language of the Settlement Agreement, the Trust Agreements and the Bankruptcy Court Order?

• How could monies in the Trust accounts legally fund or reimburse response actions not conducted pursuant to CERCLA, contrary to the intent and language of the Settlement Agreement, the Trust Agreements and the Bankruptcy Court Order?

• Can an entity (the City), simply by filing a lawsuit, seek to bypass the on-going investigations and decision-making process of the United States and the State of Michigan in determining the proper remedy at the St. Louis Site and whether monies in the Trust accounts should fund such remedy?

The United States further explains that if Plaintiff is allowed to maintain its action against the Trusts and ultimately to insist that monies in the Trust accounts be used for purposes other than as specifically designated in the Settlement Agreement and related documents, other entities will be encouraged to also try to circumvent the normal EPA remedy investigation and selection process and claim a portion of the Trust monies by filing a lawsuit. Such a result could rapidly have the effect of depleting the limited Trust assets, leaving little if anything for the cleanup of the Sites as intended by the Settlement Agreement and bankruptcy court order. Moreover, an adverse ruling

-53-

could potentially threaten other bankruptcy trusts established across the country that are or will be performing CERCLA cleanups.

Fourth, the bar for establishing inadequate representation is low: the Supreme Court has stated that Rule 24(a)'s requirement "is satisfied if the applicant shows that representation of his interest 'may' be inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mineworkers of Am.*, 404 U.S. 528, 538 n.10 (1972) (citations omitted). The Sixth Circuit has expressly noted that a proposed intervenor need not show that representation will in fact be inadequate. *Mich. State AFL-CIO*, 103 F.3d at 1247; *Ne. Ohio Coal. for the Homeless*, 467 F.3d at 1008. Among other things, the possible failure of existing parties to make all of the prospective intervenor's arguments may be sufficient to show inadequate representation. *Mich. State AFL-CIO*, 103 F.3d at 1247.

The United States asserts that neither Plaintiff nor Defendants can adequately represent the United States' interests. The United States asserts that the Successor Trust and the Custodial Trust do not share the same interests of the United States in deciding what cleanup actions at the St. Louis Site and other sites are appropriate under CERCLA. The United States asserts that the Trusts have no role in making decisions about selecting cleanup under CERCLA or prioritizing limited funding for CERCLA cleanup actions. Nor are the Trusts in a position financially to fund extensive litigation over these issues.

Even if the United States is not entitled to intervene as of right, it contends that the Court should exercise its discretion to allow the United States to intervene permissively under Rule 24(b). First, like a motion for intervention as of right, a motion for permissive intervention must be timely. *NAACP v. New York*, 413 U.S. 345, 365 (1973); *Stotts v. Memphis Fire Dep't*, 679 F.2d 579, 582

(6th Cir. 1982). The Sixth Circuit has employed the same five timeliness criteria in the context of permissive intervention as it has in the context of intervention as of right. *Stotts*, 679 F.2d at 582. Thus, the United States' arguments regarding timeliness need not be restated.

Second, under Rule 24(b)(1), the proposed intervenor's claim or defense must have a question of law or fact in common with the main action. *Purnell v. Akron*, 925 F.2d at 950-51. The United States asserts that the key question of whether monies in the trusts can be used to fund or reimburse certain response actions is shared by both the underlying action and the proposed motion to intervene.

Under Rule 24(b)(2), if the proposed intervenor is a government agency, permissive intervention can be based on a federal law or an order or agreement issued under such law. The United States asserts that its motion to intervene is predicated on the United States' interest in managing and funding proper cleanups under CERCLA as well as the Settlement Agreement and Bankruptcy Court Order creating the trusts that are the subject matter of the underlying action. Thus, the United States asserts that permissive intervention is appropriate under either Rule 24(b)(1) or

(2).

Third and last, a court must consider whether intervention would unduly delay or prejudice the adjudication of the original parties' rights. Fed. R. Civ. P. 24(b)(3); *United States v. Michigan*, 424 F.3d at 445 (upholding denial of permissive intervention that would require prolonged discovery, thus prejudicing the original parties). The United States asserts that its intervention poses no risk of undue delay or prejudice to the original parties because it will neither extend the duration of the litigation nor cause the parties to incur additional litigation costs. The United States asserts

that issues of whether the trust monies can be used to fund response actions by Plaintiff will doubtless be litigated by the parties to the underlying action regardless of whether the United States is permitted to intervene or not.

While Plaintiff opposes intervention by the United States, Plaintiff's objections are largely moot. First, Plaintiff contends that intervention by the United States cannot confer subject matter jurisdiction if it does not already exist. The United States expressly disclaims any argument otherwise. Second, Plaintiff contends that the Court should not exercise jurisdiction over the United States' potential declaratory action if Plaintiff's claims are remanded to state court. In light of the determination above that both removal bankruptcy jurisdiction and federal officer removal jurisdiction exist, these objections are moot.

The remainder of Plaintiff's brief challenges the timeliness of the United States' motion to intervene and whether the United States' interests are adequately represented by the Trusts. Plaintiff's timeliness challenge is not persuasive, as Plaintiff simply asserts that the United States' motion was filed only a few days before the scheduled hearing on Plaintiff's motion to remand in December 2007. Additionally, the United States has demonstrated that its interests "may" not be adequately represented by the Trusts or other Defendants because the United States has a unique stare decisis interest in issues affecting the administration of the bankruptcy estate through the Trusts. Thus, the Untied States' motion to intervene will be granted.

V

Finally, two motions to strike [Dkt. # 75, 79] filed by Plaintiff are also before the Court. Plaintiff requests that the Court strike the affidavits of Remy J-C Hennet and Thomas Alcamo, filed in conjunction with Defendants' recent supplemental briefs, on the basis that the Court only directed

the parties to identify supplemental legal authority, as opposed to factual updates. While the Court

only directed the parties to identify "new legal authority," it did not expressly prohibit the inclusion

of new factual evidence. The intent was simply to avoid reproducing the previous briefs in their

entirety, and it was not contemplated that any new factual evidence would be material to resolution

of the motions then pending. In fact, neither of the affidavits submitted by Defendants were material

to the resolution of the motions now decided, and Plaintiff suffered no prejudice due to their

submission. Thus, Plaintiff's motions to strike will be denied.

Accordingly, it is **ORDERED** that Plaintiff's motion to remand [Dkt. # 16] is **DENIED**.

It is further **ORDERED** that the United States' motion to intervene [Dkt. # 30] is

**GRANTED**.

It is further **ORDERED** that Plaintiff's motions to strike [Dkt. # 75, 79] are **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 25, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on March 25, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS